***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Plaintiff is Calvin E. Hildreth.
3. Defendant-employer is International Paper Company, formerly known as Federal Paper Board Company, Inc.
4. Defendant-carrier at the time of plaintiff's injury was Employers Insurance of Wausau, a mutual company.
5. Defendant-employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act. An employer-employee relationship existed between Defendant-employer and plaintiff on May 27, 1991, the date of plaintiff's injury that is the subject of this action.
6. Plaintiff's average weekly wage at the time of his injury was sufficient to yield the 1991 statutory maximum amount of $406.00 per week.
7. All parties are properly before the Commission, that the Commission has jurisdiction over the parties and subject matter, and they are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
8. Plaintiff received employer-funded Accident and Sickness short-term wage replacement benefits for the maximum 39-week period beginning October 20, 1997 and ending January 5, 1998 totaling $10,920.00.
9. In a letter dated March 12, 2002, the parties stipulated as follows: "There is no Form 28B for the May 27, 1991 date of injury in the North Carolina Industrial Commission's file on the above-referenced claim and Industrial Commission file number."
10. A set of bound and paginated forms and medical records was stipulated by the parties into evidence and submitted to the deputy commissioner after the hearing and thereafter supplemented.
 ***********
Based upon all the competent evidence of record, the Full Commission finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACT
1. Plaintiff was 56 years old at the time of the January 10, 2002 hearing before the deputy commissioner. Plaintiff attended school through the ninth grade and then subsequently received his GED. Plaintiff worked for International Paper, formerly known as Federal Paper Board, for 26 years. Plaintiff's most recent position with defendant was Industrial Millwright.
2. On May 27, 1991, plaintiff suffered an admittedly compensable injury by accident to his low back while working in the power and recovery boiler room at Federal Paper Board. While attempting to move a hydro from the pump room to the power side pump to pressurize a boiler for leaks, plaintiff's foot slipped on a substance on the floor and he slid underneath and was crushed between the air compressor and hydro pump.
3. Plaintiff reported his injury to defendants by filling out an Industrial Commission Form 18 on May 27, 1991.
4. On December 4, 1991, an Industrial Commission Form 21 accepting liability and compensability for plaintiff's injury by accident on May 27, 1991 was received at the Industrial Commission.
5. Between May 27, 1991 and June 3, 1991, plaintiff treated with the plant nurse, complaining of left shoulder pain, numbness in the left hand, pain in the posterior area between cervical area and shoulder and mid-back pain.
6. On August 9, 1991, plaintiff first presented to Dr. Donald D. Getz with burning in his hip and with radiation into his leg.
7. Dr. Getz ordered an MRI, which showed a possible nuclear herniation. Dr. Getz started plaintiff on some conservative treatment, rest, anti-inflammatory agents, and plaintiff to have a follow-up visit in one week. Dr. Getz referred plaintiff to a neurosurgeon when his condition did not improve.
8. On October 1, 1991, Dr. William P. Parker examined plaintiff for complaints of burning pain extending down the right leg. Dr. Parker noted that conservative treatment was unsuccessful and ordered a myelogram.
9. When asked whether the May 27, 1991 incident more likely than not caused or exacerbated plaintiff's back pain, Dr. Parker testified, "I think this is probably one continuous problem from beginning to end."
10. The myelogram dated October 7, 1991 showed degenerative changes and some mild foraminal encroachment in the lumbar region, worse in the right side than left. On November 11, 1991, after discussing plaintiff's case with Dr. Cromer, Dr. Parker recommended a course of physical therapy progressing to work hardening and back school for plaintiff.
11. Plaintiff was treated at Occupational Health Services from May 27, 1991 through June 1998. Dr. Cromer, with Occupational Health Services, first saw plaintiff on November 7, 1991, when plaintiff presented with low back pain and burning radiation down the posterior right leg into the calf. Diagnosing plaintiff with low back pain, appearing to be non-surgical in nature with a possible radicular component, Dr. Cromer treated plaintiff with physical therapy, including work hardening, traction, and a TENS unit.
12. Dr. Cromer referred plaintiff to Antonio Puente, Ph.D. for a pain management evaluation on January 2, 1992. Dr. Puente saw plaintiff on January 8, 1992 and found plaintiff was motivated to return to work and capable and willing to continue treatment. Dr. Puente was concerned about the emotional status of plaintiff if he could not return to work and with his returning to work before he was medically capable.
13. Plaintiff continued to treat with Dr. Cromer, proceeding with work conditioning and work hardening and experienced some improvement in 1992.
14. In March 1992, plaintiff told Dr. Cromer that he was anxious to return to work and that his position as millwright was changed from Woodyard to the Bleach Plant, a less demanding work area. Plaintiff also wrote the North Carolina Industrial Commission a letter dated March 23, 1992 expressing his desire to return to work, but seeking an additional evaluation and treatment by a back or spine specialist.
15. Defendants objected to this request claiming that Dr. Parker was who plaintiff chose for his second opinion and Chief Claims Examiner, Martha A. Barr, denied treatment by another physician, inasmuch as, plaintiff had already been treated by a physician of his choice.
16. On April 9, 1992, Dr. Cromer, noting markedly improved chronic low back pain, released plaintiff to full duties without restrictions, although adding that plaintiff would benefit with prn NMT, as well as home stretching and conditioning program.
17. Documentation provided by Dr. Getz stated that he had referred plaintiff to Dr. Parker. At the receipt of this documentation, plaintiff sent a letter dated November 15, 1993 to defendants seeking approval for a medical evaluation by a physician of plaintiff's choosing.
18. Plaintiff returned to work in April 1992 and continued to treat with Dr. Cromer and seek a second opinion.
19. From July 7, 1992 until April 7, 1993, Dr. Cromer noted that plaintiff continued to have burning lower back pain at the buttocks and used Percodan intermittently. Dr. Cromer did not assign a permanent partial impairment rating, but anticipated that there would be some degree of permanent disability related to the May 27, 1991 injury.
20. Dr. Cromer opined that although plaintiff did well for a while, plaintiff did not reach maximum medical improvement and started getting worse after he returned to work.
21. Plaintiff testified that he returned to work in April 1992 and received his last weekly compensation check in April 1992. Plaintiff never received an Industrial Commission Form 28B, nor signed an Industrial Commission Form 28B. Plaintiff's file with the North Carolina Industrial Commission does not contain an Industrial Commission Form 28B. Plaintiff was not notified that his case was closed and continued to receive treatment from Dr. Cromer, including medications, that were paid for by defendants.
22. Bill Bowman, a co-worker of plaintiff, testified that after plaintiff returned to work, he was unable to perform all of his duties due to pain for which he was taking pain medication.
23. After continued and increasing complaints of pain, Dr. Cromer decided to refer plaintiff for an evaluation by a spine surgeon. Plaintiff filed a motion with the Industrial Commission for evaluation and treatment by a physician of his choice.
24. On May 13, 1994, plaintiff requested that his claim be assigned for a hearing, because defendants denied plaintiff's request for evaluation and treatment by a physician of his choice.
25. Continuing to treat with Dr. Cromer while attempting to obtain a second opinion, plaintiff continued to have burning band-like low back pain and continued to get stiffer. Plaintiff increased the amount of Percodan that he took as his symptoms increased.
26. Dr. Cromer opined that plaintiff's history, injury, what had transpired since the incident, and continuing problems indicated that the May 27, 1991 incident at work caused his continuing back symptoms. Dr. Cromer further added that plaintiff's worsening condition and treatment was all related to the May 27, 1991 incident. Dr. Cromer explained that the May 27, 1991 injury was a significant event, which was the major factor in plaintiff's continued back problems and pain.
27. Dr. Cromer explained that in December 1995, plaintiff was diagnosed with otitis media, which was successfully treated with antibiotics and completely resolved without the need for hospitalization.
28. Dr. Alan M. Jackson, plaintiff's family physician, continued to treat plaintiff from June 1991 through the present and prescribed Percodan for back pain.
29. Plaintiff believed that he had permission from defendants to see Dr. Grubb because of his changed status to a PHP doctor and treated with him on November 22, 1996. Plaintiff presented with complaints of low back pain, bilateral buttocks pain, numbness and tingling in the lateral portion of both legs, neck, sub-scapula, and base of neck. Spinal films confirmed lumbar degenerative disc disease and Dr. Grubb prescribed physical therapy for mechanical assessment and treatment.
30. Due to continuing symptoms, Dr. Grubb recommended a workup, including a T12-sacrum discogram and post-discogram CT on January 14, 1997. Dr. Grubb diagnosed lumbar degenerative disc disease and stenosis L3-4, L4-5, and L5-S1. Dr. Grubb then recommended surgery to be performed on April 10, 1997.
31. Plaintiff requested authorization for such surgery and defendants responded that plaintiff was only seeing Dr. Grubb for the purpose of an additional impairment rating. Defendants requested further medical records from Dr. Grubb.
32. On April 10, 1997, Dr. Grubb performed surgery on plaintiff consisting of L3-4, L4-5, L5-S1 interlaminar decompression and bilateral lateral recess decompressions, L3 to sacrum stabilization with sacral alar U-rod and six Edwards vertebral screws, and L3 to sacrum fusion with left iliac crest bone graft.
33. After the surgery, plaintiff continued to communicate with defendants regarding the cost of the surgery and itemization of medical information. Plaintiff further demanded the insurer initiate temporary total disability benefits from the date of the surgery.
34. Plaintiff continued to treat with Occupational Health Services, Dr. Cromer, and the North Carolina Spine Center. Plaintiff continued treatment with home exercise, bracing, de-bracing, and physical therapy as instructed. As of November 27, 1997, Dr. Cromer felt that plaintiff's condition had improved post-surgery.
35. Plaintiff began having problems after the April 1997 surgery. Due to pain symptoms, Dr. Grubb recommended a repeat T12 to sacrum discogram and post-discogram CT, which showed L4-5 bilateral posterior tear. On April 29, 1998, Dr. Grubb recommended exploration of fusion mass with possible posterior reinstrumentation and anterior lumbar discectomy and fusion.
36. Prior to surgery, defendants referred plaintiff to Dr. Barrie J. Hurwitz for a second opinion. Dr. Hurwitz diagnosed chronic low back pain and chronic hip pain with no evidence of any abnormal straight leg raising. Dr. Hurwitz did not personally recommend further exploration take down and repeat surgery and stated that plaintiff should obtain a second independent surgical opinion. Defendants chose not to schedule a second independent surgical opinion. Dr. Hurwitz further recommended a trial of Neurontin and if that failed, Baclofen or a tricyclic anti-depressant. Dr. Hurwitz also said that EMG's of the lumbar paraspinals and lower extremities might help establish any underlying subclinical radiculopathy and that plaintiff was totally unable to perform any heavy duty or moderate duty work due to chronic pain.
37. On September 3, 1998, Dr. Grubb performed a removal of segmental instrumentation from L3 to the sacrum, exploration of fusion mass, reinstrumentation with Moss-Miami instrumentation L3-4, L3-4 discectomy and interbody fusion with left iliac crest bone graft. Plaintiff continued, thereafter, to follow-up with the North Carolina Spine Center treating with Dr. Grubb, Dr. Waller, James Peak, PT, Dr. K. Craig Boatright and Dr. Paul B. Suh. Plaintiff was treated with physical therapy and medications for pain management. Most recently, Dr. Suh recommended physical therapy for McKenzie mechanical assessment and treatment of the lumbar spine.
38. On August 31, 1999, Dr. Grubb opined that plaintiff had reached maximum medical improvement from his on-the-job injury and assigned a 25% permanent partial impairment rating to the spine.
39. Dr. Grubb declared that the injury caused an exacerbation or aggravation of a pre-existing condition causing continued back pain. Plaintiff was then referred to Chock Tsering, M.D., with Chapel Hill Neurology for pharmacological management. Dr. Tsering agreed that the continued low back pain was more than likely related to the 1991 injury.
40. Dr. Boatright opined that plaintiff's pain came from his disc, which can be injured when a person falls on his buttocks because of axial loading that goes through the spine, and that this pain caused plaintiff to undergo the operative interventions in 1997 and 1998. When asked about the likelihood for significant relief of pain for a patient after a fusion, Dr. Boatright responded that based on his personal experience as well as orthopedic spine literature, there is approximately a 70% likelihood for significant relief of pain.
41. Dr. Boatright testified that following plaintiff's fusion, he recommended that plaintiff be seen on a yearly basis or two-year basis depending on how he was doing and that he needed to continue with pain management, possibly indefinitely. Dr. Boatright opined that he did not believe that any other surgical intervention would be helpful for plaintiff.
42. In regards to limitations and restrictions, Dr. Boatright opined that plaintiff should not return to any type of activities, which require twisting, bending, or lifting on a regular or repetitive basis. Dr. Boatright added that plaintiff should not lift more than 15 to 20 pounds on a regular basis. Dr. Boatright testified that plaintiff needs to be in a situation where he can change positions frequently, every 30 minutes to an hour, in order to protect himself from developing an escalation in his back pain. Dr. Parker and Dr. Tsering confirmed that the restrictions as assigned by Dr. Boatright were reasonable given plaintiff's two surgeries and chronic pain.
43. On January 20, 1999, plaintiff wrote defendants and enclosed the most recent medical report from Dr. Grubb's office, dated November 25, 1998. Plaintiff requested that defendants change their position with respect to the acknowledgement of Dr. Grubb's opinion regarding temporary total disability. In October 2000, plaintiff requested that his claim be assigned for hearing because he believed he was entitled to payment for permanent and total disability and payment for scars.
44. On April 27, 2001, plaintiff gave notice of claim for future benefits due to the May 27, 1991 accident and April 10, 1997 date of disability by an Industrial Commission Form 18.
45. Plaintiff's physical abilities are limited as a result of his injury. He can no longer participate in his hobbies, such as fishing, hunting, or playing golf. Around the house, he was only able to cook light meals, wash a few dishes, and wash clothes. He did attempt to sweep, vacuum, and mow the lawn, but these chores were difficult for him. He paid someone else to wash his car and could only drive short distances without needing to take a break to walk around. Plaintiff could not lift weight over 15 to 20 pounds, twist, bend, stoop, kneel, or climb a ladder. He indicated that he attempted to walk in his neighborhood when he was able to do so. Plaintiff even had a special device for putting on his shoes without having to bend to reach them and was not able to lift his own grandchild. His inability to perform certain activities was due to pain in his back, which requires him to lay down in an attempt to alleviate that pain.
46. Mr. Robert E. Manning, Jr., MS, CRC performed an Independent Vocational Evaluation of plaintiff on December 9, 2002. Based on his evaluation of plaintiff and because of "[p] otential employer concerns, his loss of confidence in his physical abilities, continuing symptoms and the local labor market . . .", Mr. Manning opined, "It is not reasonable to expect that he will be able to return to work in a productive capacity. Plaintiff has experienced a loss of local labor market and complete loss of his wage earnings capacity as a result of the injury." Mr. Manning also concluded that within a reasonable degree of vocational certainty, based on his findings as to age, education, work history, physical restrictions as outlined in the medical records, his training and experience, and the interviews conducted, that plaintiff could not return to his job as a millwright or mechanic at the paper plant or any other job.
47. Plaintiff last worked for defendants on April 10, 1997 and retired from International Paper due to his disability on February 1, 1998.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident arising out of and in the course of his employment in the nature of a specific traumatic incident to his back on May 27, 1991. N.C. Gen. Stat. § 97-2(6).
2. The approval of the Industrial Commission Form 21 Agreement on December 4, 1991 relieved the employee of his initial burden of proving disability and plaintiff is entitled to the presumption that he is totally disabled. Russos v. Wheaton Indus., 145 N.C. App. 164,551 S.E.2d 456 (2001).
3. The Industrial Commission Form 21 Agreement entered into by both parties and approved by the Industrial Commission on December 4, 1991 was an Interlocutory Award. Plaintiff's claim is not time-barred under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §§ 97-47; 97-25;Pratt v. Central Upholstery Co., 252 N.C. 716, 115 S.E.2d 27 (1960); Beardv. Blumenthal Jewish Home, 359 S.E.2d 261, 87 N.C. App. 58 (1987);Scurlock v. Durham County General Hospital, 136 N.C. App. 144,523 S.E.2d 439 (1992).
4. The May 27, 1991 injury was one of the direct and natural causes of Plaintiff's continued back problems that resulted in the need for surgery. English v. J.P. Stevens Co., 98 N.C. App. 466, 391 S.E.2d 499
(1990).
5. Plaintiff's disability resulted from the original May 27, 1991 injury by accident and not "an independent intervening cause attributable to claimant's own intentional conduct." Horne v. Universal Leaf TobaccoProcessors, 119 N.C. App. 682, 685, 459 S.E.2d 797, 799, disc. rev.denied, 342 N.C. 192, 463 S.E.2d 237 (1995).
6. Plaintiff is entitled to compensation for the disability he sustained as a result of his injury by accident, at the rate of $406.00 per week beginning April 10, 1997 and ongoing until further Order of the Industrial Commission, subject to a credit to defendants for the $10,920.00 of Employer-funded Accident and Sickness short-term wage replacement benefits paid to plaintiff. N.C. Gen. Stat. §§ 97-29, 97-2(9).
7. Plaintiff is entitled to medical compensation for his compensable injury by accident to the extent that such treatment tends to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. §97-25.
8. Defense of this claim by defendants was not unreasonable. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff in the amount of $406.00 per week from April 10, 1997 and continuing until plaintiff returns to work or further Order of the Industrial Commission, subject to a credit to defendants for the $10,920.00 of employer-funded Accident and Sickness short-term wage replacement benefits paid to plaintiff and an attorney's fee set out below.
2. Defendants shall pay all medical compensation, past and future, incurred by plaintiff as the result of his injury, including but not limited to, the treatment rendered by Dr. Stephen Grubb, Dr. K. Craig Boatright, Dr. Chock Tsering, and Dr. Paul B. Suh.
3. An attorney's fee in the amount of 25% of the compensation awarded in Paragraph 1 is hereby APPROVED for plaintiff's counsel. The accrued portion of the fee shall be deducted from the accrued benefits and paid directly to counsel for plaintiff. Thereafter, defendants shall forward every fourth check to counsel for plaintiff.
4. Defendants shall pay the costs.
This the 3rd day of March 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DCS/llc